[No. 14231.   Department One.   January 31, 1918.]

THE STATE OF WASHINGTON, *Respondent,* v.
C. H. TURFEY *et al., Appellants.*[1]

LARCENY—EVIDENCE—SUFFICIENCY.  A conviction of larceny of
thirty sacks of wheat from a field is supported by the evidence,
where two witnesses who were hauling the wheat testified that thirty
sacks were hauled away in the night by unknown parties, and the
sheriff traced tracks from the field to and along the county road
until he overtook the defendants hauling the thirty sacks which
were identified, and one of the defendants when apprehended made
damaging admissions.

CRIMINAL LAW—EVIDENCE—REPUTATION OF DEFENDANT.  Allowing
a reputation witness to testify that he was so situated as to know
defendant's reputation and that he never heard it questioned, in ef-
fect amounts to testimony that his reputation was good.

SAME—APPEAL—HARMLESS ERROR—EVIDENCE.  It is not prejudicial
error to strike the testimony of a witness that defendant's reputa-
tion was good, where the witness afterwards testified from his own
knowledge to the same effect.

SAME.  Error cannot be predicated upon the admission of evi-
dence in rebuttal which might have been made a part of the state's
case in chief, where it contradicted the defendant's testimony upon
a vital detail.

Appeal from a judgment of the superior court for
Lincoln county, Sessions, J., entered January 6, 1917,
upon a trial and conviction of grand larceny.  Affirmed.

*Martin & Jesseph,* for appellants.
*J. D. McCallum,* for respondent.

PARKER, J.—The defendants, Turfey and Keyes,
were jointly charged with stealing thirty sacks of
wheat, the property of Wm. Maurer, in Lincoln county,
on October 18, 1916.  They were tried together in the
superior court for that county, which resulted in ver-
dicts of guilty and judgments rendered thereon

[1]Reported in 170 Pac. 335.

against both of them, from which they have both appealed to this court.

It is contended in appellants' behalf that the evidence does not support the verdicts and judgments, especially in that appellants were not connected with the theft of the wheat, if there was any such theft. It seems to us that there is little room for arguing that the evidence does not warrant the conclusion that the wheat was stolen by some one at the time charged. The wheat was in sacks in a pile in Maurer's field, where it had been threshed, about one-half mile from the county road. Witnesses Fichtenburg and Lopstein were working for Maurer, hauling wheat from this pile to market. Their story of the theft is, in substance, as follows: On the afternoon of October 17, when they took away the last load for that day, they left eighty-five sacks of wheat in the pile in the field, which they then counted. When they returned to their work on the morning of the 18th, about 7 o'clock, there were only fifty-five sacks of wheat in the pile. They had not taken the thirty sacks away themselves. At that time they found fresh wagon tracks near the pile. These wagon tracks and the tracks of the four horses which had drawn the wagon were such as to render it certain to their minds that they were not the tracks of their own wagons or horses. Two of the horses left tracks showing that they were shod, while the tracks of the other two showed that they were barefoot. The tracks of these four horses and the wagon were traced into and out of the field, past the pile of sacks to the county road. It is plain from the evidence that no one but these two witnesses were hauling wheat from this field for Maurer, and that no one else had any right to haul wheat from the Maurer field, and that Maurer himself did not haul the thirty sacks away. This evidence was clearly sufficient to warrant

the jury in believing that the thirty sacks of wheat were stolen at some time between the last time these two witnesses were there during the afternoon of the 17th and when they returned to work about 7 o'clock on the morning of the 18th.

Soon after the theft was discovered, the sheriff, with one of his deputies, came to Maurer's place and began an investigation of the theft. The sheriff saw the tracks of the wagon and the horses, showing two of them to be shod while the other two appeared to be barefoot. He traced the tracks from the pile of sacks out to the county road, and north and west along the county road for about fourteen miles, when he overtook the defendants driving a four horse team and wagon loaded with thirty sacks of wheat corresponding with Maurer's wheat as to kind and as to the kind of sacks in which it was contained. Two of these horses were shod and two of them were barefoot. The sheriff and his deputy could not trace the tracks at all points, but could along most of the way from Maurer's field to where they overtook the defendants. Keyes was driving and Turfey was walking along near the wagon. The sheriff and his deputy stopped and arrested the defendants. They all then proceeded to town, Turfey riding with the deputy in the automobile in which he and the sheriff had followed the defendants, while the sheriff and Keyes proceeded in the wagon. The sheriff testified as to his conversation with Keyes in part as follows:

"Q. Just state to the jury what that conversation was? A. Well, I guess about the first of it, I told him to hold on, and I got up. I asked Mr. Keyes whose wheat that was. He says it belongs to this man (indicating). He pointed down to the gentleman walking along the side. . . . A. I ordered the other man (Turfey) to get in the car with the deputy, and I got up in the rig with Mr. Keyes, and asked him where he

got that wheat, and he said they got it out southwest or southeast somewhere. I said: 'Is any of it your wheat?' He said, 'No.' I said, 'You are to get half of it.' He says 'No, I am not to get any of it. I was a fool for coming along.' I says, 'Have you been stopping with him?' 'Yes' he says, 'I have been there for several days; I have been sick and he wanted me to go with him and get a load of wheat.' I said, 'What time did you leave home?' He says, 'About six or seven last night.' . . . Q. Did you speak to Mr. Turfey then? A. Yes, sir. Q. What was the conversation that took place? Will you repeat it for us? A. I asked him first if that was his wheat. He said, 'Yes.' I asked him where he got it and he said he got it out west. Q. That is what Turfey said? A. Turfey said it; yes. Q. Got it out west? A. Yes. Q. Were you both in hearing of Mr. Keyes at that time? A. Yes, sir; right alongside of the wagon."

The deputy testified, in substance, the same as the sheriff, except that he did not hear all of the conversation. The wheat was identified by witnesses for the state as Maurer's wheat by the kind of sacks it was in, the two different kinds of thread the sacks were sewed with, and the peculiar kind of stitch used in sewing some of the sacks which was used by one of Maurer's sack sewers. We think the evidence was sufficient to carry the case to the jury upon the question of the guilt of both defendants, as well as upon the question of there having been an actual theft of Maurer's wheat. It is true that appellants claim to have got the wheat elsewhere and that it belonged to Turfey, but we think the jury was not required to believe the story of appellants and their witnesses in that respect. We cannot see our way clear to disturb the verdicts and judgments upon the ground of insufficiency of the evidence to support them.

One Zehner was called as a witness in behalf of appellant Turfey to testify to his good character, and

after apparently qualifying himself to so testify stating his knowledge of Turfey's reputation, he said Turfey's reputation was good.   On cross-examination, Zehner testified as follows:

"Q.  How do you know this man's reputation is good, Mr. Zehner?  Tell the jury how you happen to know it?  A.  Just by my own experience I guess is all I know, what he has done for me on the ranch since I knew him."

Following which, at the instance of the prosecuting attorney, the court struck out the testimony of Zehner that Turfey's reputation was good.   Thereafter, on re-examination by counsel for Turfey, Zehner testified as follows:

"Q.  Now, Mr. Zehner, have you ever talked to any of your neighbors about this man Turfey, and whether or not he has a good reputation?  A.  Yes, I have. Q.  Who have you talked with about it?  A.  I don't know—all the neighbors.  We just say he is a fine man since I have been there, and other people know him longer than I.  Q.  Do you recollect whom you have talked with about the matter?  A.  Mr. Zagelow, Mr. Link, my closest neighbors.  We just say like we would about any neighbor, you know.  Q.  During all this time, this six years, have you heard anybody say he was dishonest?  A.  No.  Q.  Ever hear his reputation for honesty questioned by anyone?  A.  No."

Thereupon objection was made by the prosecuting attorney to these questions and answers, and, while the record seems to indicate a sustaining of such objection by the court, it is plain, we think, that the ruling of the court was not such as to indicate to the jury the exclusion of this testimony given upon redirect examination, but only had the effect of preventing further examination along that line.  This is claimed as error on the part of the court, seemingly upon the theory that the court excluded this testimony given

upon reexamination; but we do not so read the record.
So, as it seems to us, appellant had the full benefit of
this negative testimony as to Turfey's reputation,
which, according. to some authorities, was, in effect,
the same as if the witness had said Turfey's reputation
was good.   This, upon the theory that one who is well
acquainted with people who know a person, and is so
situated as to know such person's reputation, and tes-
tifies that he never heard such person's reputation
questioned, in effect testifies to his good reputation.
40 Cyc. 2684.  We note in this connection that Turfey
had five other witnesses who testified upon the trial
to his good reputation.  It seems quite clear to us that
there was no prejudicial error committed by the court
in its ruling here complained of, and that there was
not even technical error in striking the testimony of
the witness Zehner that Turfey's reputation was good,
in view of the fact that he so testified from his own
knowledge of Turfey rather than from what others
thought of him, given prior to his redirect examina-
tion.

It is contended in appellants' behalf that the court
erred in permitting the witness Downie to testify in
rebuttal as to statements made by Turfey after he had
been arrested, which were inconsistent with his testi-
mony given upon the trial.  Downie testified that, at
the jail where Turfey was being detained, he, Turfey,
had a conversation with another person which Downie
overheard, and testified concerning, as follows:

"This party asked Mr. Turfey—he says: 'I hear
you got into some trouble.' He says, 'Yes.' Then he
asked what was the trouble? He says, 'I got caught
with a load of wheat.' He says, 'Where did you get
this wheat?' He says, 'I got it east of the Grant
schoolhouse.' This man says, 'Is the party that owned
the wheat in the country?' He says, 'I don't know
whether he is or not.' He says, 'If you were out do

you think you could find him?' and Mr. Turfey says, 'I think I could.' "

The objection urged against this testimony is that it was given upon rebuttal and was, in effect, a part of the state's case. It is true that the testimony might have been given in evidence as a part of the state's case, but it is also true that it is inconsistent with and contradicts Turfey's testimony given upon the trial, wherein he claimed to have gotten the wheat from a man from whom he had purchased it some miles west of the Grant schoolhouse. It seems to us that this was not prejudicial error, though it is possible Turfey ought to have been permitted to introduce some further evidence upon that subject, had he requested to do so, which he did not do.

Some contention is made in appellants' behalf that the trial court erred in refusing to give a requested instruction upon the weight to be given circumstantial evidence. While the court did not give the instruction requested, it did give another instruction in somewhat briefer form which, however, we think was as favorable to the defendants as the instructions requested. It seems quite clear to us that there was no prejudicial error in this respect. Some other errors are suggested, but we think they are so clearly without merit that they do not call for discussion here. We think the record shows no prejudicial error preventing the defendants having a fair trial.

The judgment is affirmed.

ELLIS, C. J., FULLERTON, WEBSTER, and MAIN, JJ., concur.